**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | |
|---|---|
| AIMEE KRAUSE, individually and on behalf of all others similarly situated,<br><br>*Plaintiff*,<br><br>*v*.<br><br>ROCKETREACH, LLC, a Wyoming limited liability company,<br><br>*Defendant*. | Case No. 21-cv-01938<br><br>Honorable Elaine E. Bucklo |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

## TABLE OF CONTENTS


**I. INTRODUCTION** .......... 1

**II. BACKGROUND** .......... 2

**III. ARGUMENT** .......... 4

**A. RocketReach's Use of Plaintiff's Identity Violates the IRPA.** .......... 4

**1. The IRPA's (b)(1) exception does not apply because Defendant's free previews are not excepted material and are, in and of themselves, commercial advertisements.** .......... 7

**2. The IRPA's (b)(2) exception does not apply because Defendant's free previews have a specific commercial purpose.** .......... 10

**3. The IRPA's (b)(4) exception does not apply because the free previews are used to advertise RocketReach's subscription services—not a report about Plaintiff.** .......... 11

**B. The First Amendment Does Not Bar This Lawsuit** .......... 13

**1. The First Amendment status of Defendant's database is not at issue here** .......... 14

**2. The free previews are commercial speech that reference a specific product** .......... 15

**3. As commercial speech, the free previews are subject to the limitations provided by the IRPA.** .......... 17

**C. The Communications Decency Act Is Inapplicable to Defendant's Free Preview Advertisements** .......... 18

**D. The IRPA Does Not Violate the Dormant Commerce Clause** .......... 21

**IV. CONCLUSION** .......... 23

# TABLE OF AUTHORITIES

## United States Supreme Court Cases

*Bd. of Trs. of State Univ. of N.Y. v. Fox*,
492 U.S. 469 (1989)....16

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007)....3

*Bolger v. Youngs Drug Prods. Corp*.,
463 U.S. 60 (1983)....15, 16

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*,
447 U.S 557 (1980)....17

*Healy v. Beer Inst., Inc*.,
491 U.S. 324 (1989)....22

*Zacchini v. Scripps-Howard Broad. Co*.,
433 U.S. 562 (1977)....18

## United States Circuit Court of Appeals Cases

*Agnew v. Nat'l Collegiate Athletic Ass'n*,
683 F.3d 328 (7th Cir. 2012) ....6

*Almeida v. Amazon*,
456 F.3d 1316 (11th Cir. 2006) ....12

*Ben Ezra, Weinstein, & Co., Inc. v. Am. Online Inc.*,
206 F.3d 980 (10th Cir. 2000) ....21

*Charles v. City of Los Angeles*,
697 F.3d 1146 (9th Cir. 2010) ....16

*Chi. Lawyers' Comm. For Civil Rts. Under Law, Inc. v. Craigslist, Inc*.,
519 F.3d 666 (7th Cir. 2008) ....20

*Commodity Trend Serv., Inc. v. Commodity Futures Trading Comm'n*,
149 F.3d 679 (7th Cir. 1998) ....10, 11

*Dex Media W., Inc. v. City of Seattle*,
696 F.3d 952 (9th Cir. 2012) ....14

*Envt'l Def. Fund v. Massey*,
986 F.2d 528 (D.C. Cir. 1993) ....................................................................................22

*FTC v. Accusearch Inc.*,
570 F.3d 1187 (10th Cir. 2009) ..................................................................................19

*Harmon v. Gordon*,
712 F.3d 1044 (7th Cir. 2013) ......................................................................................6

*Housing Council of San Fernando Valley v. Roommates.com, LLC*,
521 F.3d 1157 (9th Cir. 2008) ....................................................................................18

*Huon v. Denton*,
841 F.3d 733 (7th Cir. 2016) ..............................................................................18, 19

*Jordan v. Jewel Food Stores, Inc.*,
743 F.3d 509 (7th Cir. 2014) ..............................................................................15, 17

*Lemmon v. Snap, Inc.*,
995 F.3d 1085 (9th Cir. 2021) ............................................................................18, 19

*Nieman v. VersusLaw Inc.*,
512 F. App'x 635 (7th Cir. 2013) .................................................................................9

*Pearson v. Edgar*,
153 F.3d 397 (7th Cir. 2006) ......................................................................................17

*United States v. Benson*,
561 F.3d 718 (7th Cir. 2009) ......................................................................................15

*Wollschlaeger v. Governor*,
848 F.3d 1293 (11th Cir. 2017) ..................................................................................17

*Wright v. Assoc. Ins. Cos.*,
29 F.3d 1244 (7th Cir. 1994) ........................................................................................3

**United States District Court Cases**

*Bosley v. Wildwett.com*,
310 F. Supp. 2d 914 (N.D. Ohio 2004)..........................................................17, 18

*Callahan v. Ancestry.com Inc.*,
No. 20-cv-08437, 2021 WL 2433893 (N.D. Cal. June 15, 2021).....................................20

*Callahan v. Ancestry.com Inc.*,
No. 20-cv-08437, 2021 WL 783524 (N.D. Cal. Mar. 1, 2021) ....................................... 20

*Dobrowolski v. Intelius, Inc.*,
No. 17 CV 1406, 2018 WL 11185289 (N.D. Ill. May 21, 2018) ...................................... 12

*Dobrowolski v. Intelius, Inc*.,
No. 17 CV 1406, 2017 WL 3720170 (N.D. Ill. Aug. 29, 2017) ................................. 21, 22

*Felty v. Driver Sols., LLC*,
No. 13 C 2818, 2013 WL 5835712 (N.D. Ill. Oct. 30, 2013) ............................................. 4

*Gabiola v. Sarid*,
No. 16-CV-02076, 2017 WL 4264000 (N.D. Ill. Sept. 26, 2017) ............................ *passim*

*Hadley v. Gatehouse Media Freeport Holdings, Inc.*,
No. 12 C 1548, 2012 WL 2866463 (N.D. Ill. July 10, 2012) ........................................... 21

*In re Facebook Biometric Info. Privacy Litig*.,
No. 3:15-cv-03747, 2018 WL 2197546 (N.D. Cal. May 14, 2018) .................................. 22

*Kolebuck-Utz v. Whitepages Inc*.,
No. 21 C 0053, 2021 WL 1575219 (W.D. Wash. April 22, 2021) ........................... *passim*

*Life After Hate, Inc. v. Free Radicals Project, Inc.*,
No. 18 C 6967, 2020 WL 1903956 (N.D. Ill. Apr. 16, 2020) ........................................... 11

*Lukis v. Whitepages Inc.*,
454 F. Supp. 3d 746 (N.D. Ill. 2020) ............................................................... *passim*

*Lukis v. Whitepages Inc.*,
No. 19 C 4871, 2020 WL 6287369 (N.D. Ill. Oct. 27, 2020) ........................................... 15

*Obado v. Magedson*,
No. 13-cv-2382, 2014 WL 3778261 (D.N.J. July 31, 2014) ............................................. 9

*Parker v. PayPal*,
No. 16-4786, 2017 WL 3508759 (E.D. Pa. Aug. 16, 2017) ....................................... 20, 21

*Rivera v. Google Inc.*,
238 F. Supp. 3d 1088 (N.D. Ill. 2017) ............................................................... 21

*Stayart v. Google Inc.*,
783 F. Supp. 2d 1055 (E.D. Wis. 2011) ............................................................... 9

*Thompson v. Getty Images (US), Inc.*,
No. 13 C 1063, 2013 WL 3321612 (N.D. Ill. July 1, 2013) ....................................11, 12

*Vrdolyak v. Avvo, Inc.*,
206 F. Supp. 3d 1384 (N.D. Ill. 2016) ....................................................................8, 9, 14

**Illinois Supreme Court Cases**

*Maksym v. Bd. of Elec. Comm'rs of City of Chi.*,
950 N.E.2d 1051 (Ill. 2011) ..........................................................................................10

**Illinois Appellate Court Cases**

*Blair v. Nev. Landing P'ship*,
859 N.E.2d 1188 (Ill. App. Ct. 2006) ............................................................................17

**Miscellaneous Authority**

47 U.S.C. § 230 ..................................................................................................2, 18, 20

765 ILCS 1075 ............................................................................................................ *passim*

HB 1422, Tr. of House Debate, 90th Ill. Gen. Assem. (April 24, 1997) ......................................17

## I. INTRODUCTION

The Illinois Right of Publicity Act ("IRPA" or "the Act") prohibits, with some narrow exceptions, the "use [of] an individual's identity for commercial purposes" without consent. 765 ILCS 1075/30(a). The website operated by Defendant RocketReach LLC ("RocketReach" or "Defendant") uses the identities of specific Illinois residents—including their first and last names, along with other identifying attributes such as the name of their employers, their employment positions, and their location—in free preview advertisements to promote and sell subscriptions to its online database of contact information. Because these individuals never consented to the use of their identities in Defendant's online advertising, Plaintiff Aimee Krause alleges that Defendant has violated her rights under the Act.

Though Defendant decries Plaintiff's complaint as "strain[ing] both the facts and the law," (Am. Memorandum in Support of Rule 12(b)(6) Motion to Dismiss, dkt. 22, ["Mot."] at 1), multiple courts have already examined virtually identical allegations and concluded that the conduct alleged here is "a textbook example . . . of using a person's identity for a commercial purpose." *Lukis v. Whitepages Inc.*, 454 F. Supp. 3d 746, 760 (N.D. Ill. 2020) (denying motion to dismiss IRPA claims), *reconsideration denied*, No. 19 C 4871, 2020 WL 6287369 (N.D. Ill. Oct. 27, 2020) (Feinerman, J.); *see also Kolebuck-Utz v. Whitepages Inc.*, No. 21 C 0053, 2021 WL 1575219 (W.D. Wash. April 22, 2021) (applying Ohio's right of publicity statute). Unsurprisingly, the arguments advanced by the instant motion to dismiss tread no new ground. They should all be rejected.

First, Defendant says that it is immune from suit under three of the IRPA's statutory exceptions, which apply to descriptions of books (the (b)(1) exception), news reports (the (b)(2) exception), and materials that promote things like books or news reports (the (b)(4) exception).

But each argument fails because Defendant refuses to address the allegations pleaded: Plaintiff takes issue with Defendant's free preview advertisements and not, as the Defendant would have it, the contents of its online database. Indeed, while the database *might* conceivably be outside the Act's scope, the free previews are not because they are provided only to encourage website visitors to sign up for Defendant's paid subscriptions.

Second, Defendant repeats its IRPA exception arguments but argues that its conduct is fully protected under the First Amendment. But once again, the First Amendment status of Defendant's database is not at issue in this case and Defendant offers nothing to suggest that its free preview advertisements are not regulable under the IRPA as commercial speech.

Third, Defendant contends that because it does not generate the identifying information on its website, it is immune under the Communications Decency Act, 47 U.S.C. § 230(c)(1) (the "CDA"). The argument again fails to address the allegations at issue: Plaintiff alleges that Defendant *creates* the free preview advertisements at issue here and, moreover, affirmatively curates the underlying information. Because Defendant's website is not a passive conduit where third parties disseminate actionable material, Defendant is not immune under the CDA.

Fourth, Defendant suggests the IRPA violates the dormant commerce clause because applying it would effectively regulate conduct outside of Illinois. But the argument is premature and without support: Courts regularly enforce Illinois consumer protection laws against companies that operate online in cases where, like here, a lawsuit only addresses Illinois-based conduct.

The Motion should be denied.

## II. BACKGROUND

Through its website, Defendant sells paid subscription access to what it describes as "the world's largest and most accurate database of emails and direct dials." (Complaint, dkt. 1

["Compl."] ¶ 13.) Defendant compiles this database itself, using information obtained from a variety of sources. (*Id.*) The subscriptions are marketed to businesses—i.e., "companies large and small"—to generate business leads. (*Id.*)

When a non-subscriber visits the RocketReach website, they can run a search through Defendant's database by typing in a first and last name into the search bar. (*Id.* ¶ 15.) The website will then display a free preview of results found in the database, which show certain identifying information of individuals found in its records:




(*Id.*) Critically, while the RocketReach website is specifically marketed for its massive database of "emails and direct dials," neither are displayed in the free previews. Rather, the free previews contain clickable hyperlinks (*e.g.*, the reference to the "+Phone plans" shown above) that invite visitors to "upgrade" to monthly or annual subscription packages, which—once paid for—will let users fully access the material in the RocketReach database. (*Id.* ¶¶ 16-17.) Defendant never seeks permission before using these featured individuals' names or information in these free preview advertisements. (*Id.* ¶ 19.) Plaintiff filed this lawsuit after she discovered that her identifying information was specifically used by RocketReach in this fashion. (*Id.* ¶¶ 21-24.)

Unsatisfied with the allegations presented in the Complaint, Defendant submits its own materials and asks the Court to take judicial notice of its entire website, including descriptions of its functionality. (Mot. at 2-3, Ex. 1.) This is improper. While a court may certainly take judicial notice of fully versions of documents that are partially quoted in a complaint (such as a contract or "published articles"), (Mot. at 2-3 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 568 n.13 (2007); *Wright v. Assoc. Ins. Cos.*, 29 F.3d 1244, 1248 (7th Cir. 1994)), Defendant here asks the

Court to consider various pages and functionalities purportedly built into the RocketReach website as of a specific date that are *not* featured anywhere in the pleadings and *not* subject to judicial notice. (*See generally* Mot. Ex. 1.) Further, while courts occasionally take judicial notice of the contents of certain governmental websites, they routinely reject requests like the one Defendant makes here. *See, e.g.*, *Felty v. Driver Sols., LLC*, No. 13 C 2818, 2013 WL 5835712, at *3 (N.D. Ill. Oct. 30, 2013) ("Due to the evolving nature of websites, this Court is neither required nor inclined to take judicial notice of any website material at this time."). Only discovery will tell what relevance the "appearance and operation" of parts of RocketReach's website as of "April 12, 2021" have on Plaintiff's claim. (Mot. Ex. 1 ¶ 2.) Plaintiff notes, however, that even the materials submitted through the declaration of Christopher Long appear to be consistent with the free preview advertising featured in the Complaint: the "free lookups" still only provide partial information (and specifically exclude phone information) and all still appear to include the hyperlinks to Defendant's subscription signup pages. (*See id.* ¶¶ 8-9.)

## III. ARGUMENT

### A. RocketReach's Use of Plaintiff's Identity Violates the IRPA.

The IRPA provides that "[a] person may not use an individual's identity for commercial purposes during the individual's lifetime without having obtained previous written consent …" 765 ILCS 1075/30(a). An individual's identity includes "any attribute of an individual that serves to identify that individual to an ordinary, reasonable viewer or listener, including but not limited to … name." 765 ILCS 1075/5. A "commercial purpose" includes the "public use or holding out of an individual's identity … on or in connection with the offer for sale … of … services." *Id*.

Multiple courts have applied these elements to fact patterns almost identical those alleged here and all have reached consistent results. In *Lukis v. Whitepages*, the court considered two

people search websites that, exactly like the website at issue here, provided site visitors with "free previews" of contact information for individuals contained in their online databases.[1] Each of those previews contained identifying information of the searched-for individual, purporting to display some, but not all, of the information contained in the defendants' databases. 454 F. Supp. 3d at 752-55. The previews also included hyperlinks that, once clicked on, would lead to a new webpage that allowed visitors to pay for a "monthly subscription [that would enable a] subscriber to view background reports of persons in [the defendants' databases]." *Id.* at 755. The *Lukis* court held that the use of a plaintiff's "identity—reflected by her name, age range, and city of domicile, along with the names of some of her relatives—in free previews used to advertise, promote, and offer for sale [a defendant's] monthly subscription services" was "a textbook example under the IRPA of using a person's identity for a commercial purpose." *Id.* at 760.

Likewise, the court in *Kolebuck-Utz v. Whitepages Inc.*, analyzed the same fact pattern (i.e., the free previews displayed on the Whitepages website) and similarly concluded that the use of "free preview[s] … as an enticement to purchase [a] subscription service" violated Ohio's right of publicity statute.[2] 2021 WL 1575219, at *2 ("Here, Plaintiff's complaint clearly alleges that Defendant displayed Plaintiff's name and identifying information on its website, in what has been described as a free preview, as an enticement to purchase Defendant's subscription service."). And in a slightly different context, in *Gabiola v. Sarid* the court found that a website's use of individuals' public arrest records to advertise a paid-for subscription service violated the IRPA and Florida's right of publicity statute. No. 16-CV-02076, 2017 WL 4264000, at *6 (N.D.

---

[1] Judge Feinerman's order in *Lukis* addressed the allegations of two cases that had been related under Local Rule 40.4.

[2] The Ohio statute provides that "a person shall not use any aspect of an individual's persona for a commercial purpose" without consent. Ohio Rev. Code § 2741.02. It defines "commercial purpose" as "the use of or reference to an aspect of an individual's persona . . . For advertising or soliciting the purchase of products, merchandise, goods, [or] services[.]" Ohio Rev. Code § 2741.01.

Ill. Sept. 26, 2017) ("Plaintiffs here clearly allege that defendants are using their likenesses, in the form of arrest photographs, without their consent to solicit enrollment in the subscription removal service.").

The same result is warranted here. Exactly like *Lukis* and *Kolebuck-Utz*, Plaintiff alleges that RocketReach's free previews use her identity—i.e., her name, along with other identifying attributes such as her employer, her employment position, and her residence city—to encourage visitors to purchase a monthly RocketReach subscription. (Compl. ¶ 21-23.) Plaintiff never consented to that use. (*Id.* ¶ 23); *accord* *Gabiola*, 2017 WL 4264000, at *6. As Judge Feinerman held in *Lukis*, these allegations present "a textbook example" of an IRPA violation. *Lukis*, 454 F. Supp. 3d at 760 (collecting cases).

Defendant does not seriously contest that Plaintiff states a prima facie case for liability under the IRPA.[3] Rather, it says that its use of Plaintiff's identity without her consent is permitted under three of the IRPA's enumerated exceptions, which allow for (i) descriptions of individuals in books, articles, or other such works (so long as those descriptions do not "constitute . . . a commercial advertisement for . . . services"), 765 ILCS 1075/35(b)(1), (ii) the non-commercial use of persons' identities in things like news reports, 765 ILCS 1075/35(b)(2), and (iii) the advertisement of material otherwise not subject to the IRPA, like books or news

[3] In a footnote, RocketReach suggests that the entire case should be dismissed because "Plaintiff does not clearly allege RocketReach 'used' her identity…[because] she does not allege that anyone [searched for] or viewed her name" on the RocketReach website. (Mot. at 7, n.1.) The suggestion is off target. First, RocketReach cannot rely on an undeveloped argument made in a footnote as an independent basis for complete dismissal. *See Harmon v. Gordon*, 712 F.3d 1044, 1053 (7th Cir. 2013) ("We have often said that a party can waive an argument by presenting it only in an undeveloped footnote"). But even if the argument were properly presented, it is contrary to the pleadings: Plaintiff *specifically* alleges that her name appeared in one of Defendant's free previews—not simply that her name was passively included in a database. (Compl. ¶ 22.) And even if that allegation regarding the Defendant's use of her identity were unclear (it is not), the Court must draw inferences in Plaintiff's favor—not RocketReach's. *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 334 (7th Cir. 2012).

reports, 765 ILCS 1075/35(b)(4). None of these exceptions, however, have any applicability to the free previews at issue here, or RocketReach's advertised subscription packages.

**1. The IRPA's (b)(1) exception does not apply because Defendant's free previews are not excepted material and are, in and of themselves, commercial advertisements.**

Defendant first contends that its website falls under IRPA's (b)(1) exemption because the RocketReach's website is like a book, article, or other visual work that "does not constitute in and of itself a commercial advertisement for a product, merchandise, goods, or services." (Mot. at 7 (quoting 765 ILCS 1075/35(b)(1)). In particular, Defendant compares its database of contact information to an online version of a phone directory and says that its individual search results about Plaintiff (and other individuals) are "informational," not advertising. (*Id.* at 8-9.) But Defendant utterly refuses to engage with the pleadings: the Complaint does not take issue with the RocketReach database but, instead, addresses the free previews—each of which encourages visitors to pay for a subscription to Defendant's services. The argument fails as a result.

This same tactic was attempted—and rejected (twice)—in *Lukis*. There, the defendant argued that its database and constituent "background reports" were "effectively an online book or encyclopedia about people." *Lukis*, 454 F. Supp. at 761 (quotations omitted). But in that case, the plaintiff's "IRPA claim [was] directed at the free previews, not the background reports." *Id.* at 762. As such, even if the underlying background reports were akin to a book or articles, the free previews—which only provided a snapshot of the content for defendants' databases and were provided to encourage visitors to pay for a subscription—were nothing like a "book" or "article" and, in any event, were "alleged to be 'a commercial advertisement for a product, … goods, or services," and therefore fell outside the scope of the Section 35(b)(1) exception. *Id.* (quoting 765 ILCS 1075/35(b)(1)). The same is true here: Plaintiff's complaint addresses the free

previews appearing on the RocketReach website, each of which includes a hyperlink encouraging visitors to pay for Defendant's monthly subscriptions. Thus, even if the underlying content of the RocketReach database is akin to a book and is not "in and of itself" an advertisement, the free previews are not.[4]

None of the cases cited by Defendant challenge this straightforward conclusion. Defendant's leading case, *Vrdolyak v. Avvo, Inc.*, concerned a website, Avvo.com, that provided a searchable online directory of attorneys. 206 F. Supp. 3d 1384, 1386 (N.D. Ill. 2016). The Avvo.com directory was completely free to use (none of the underlying information was hidden behind a paywall or subscription service) and, like traditional print media, included advertising on some, but not all, of the directory's attorney profile pages. *Id.* at 1386, 1388. The court therefore analogized Avvo.com to publications that have long-received First Amendment protection despite their inclusion of advertising alongside of otherwise protected speech, such as a yellow pages directory or a magazine like *Sports Illustrated*. *Id.* at 1388-89. Because the defendant merely "publishe[d] non-commercial information and [sold] and [placed] advertisements within that information," its use of the plaintiff's identity on a profile page was protected by the First Amendment and, in turn, incurred no liability under the IRPA. *Id.* at 1389.

But unlike *Vrdolyak*, here, Defendant's online directory is *not* free to use (rather, part of it is hidden behind a paywall and can only be accessed by full subscribers) and the RocketReach

[4] Relying on its improper request for judicial notice, Defendant says that any visitor can create a "free account[]" that "allow[s] them to access RocketReach's website, perform searches, and view profiles." (Mot. at 13.) But that's not only a matter for summary judgment, it is simply not true. Defendant's own exhibit suggests that a free account lets users perform a few "free" searches, but the complete results of those "free" searches are still locked behind a paywall, and still entice visitors to proceed with a monthly or annual subscription to the website. (*See* Mot. Ex. 1 ¶ 8 ("free" search results still displaying hyperlink for the "+Phone plans").) As noted above, Defendant markets the fact that its database includes email and phone contact information for "lead" generation, but only provides that information to paying customers. The only purpose of the free previews is to convince visitors to subscribe.

website incorporates an ad for Defendant's own services into each one of its free preview advertisements. As the court in *Gabiola* summed up, the information provided in the free previews "work together with links directly to the checkout page" for RocketReach's monthly subscription packages. *See* 2017 WL 4264000, at *6 (discussing *Vrdolyak*). Thus, while free directories like Avvo.com might be "more akin to a yellow pages directory" and may provide information alongside of advertisements regarding third parties' products or services (and, in turn, generate advertising revenue for the publication without turning the underlying material into commercial speech, (*see* Mot. at 10 (discussing concept of "advertising adjacency")), the free previews at issue here are designed solely to "generate[] revenue for defendant[]." *Gabiola*, 2017 WL 4264000, at *6. *Accord Lukis*, 454 F. Supp. 3d at 762 (free previews with embedded commercial hyperlinks did not fall under Section 35(b)(1) exception because "they are alleged to be 'a commercial advertisement for a product, … goods, or services'"). Accordingly, there is no risk—as Defendant warns—that entities (like newspapers) would risk liability "simply because [they] generated revenue from advertisements placed by others in the same field." (Mot. at 8 (quoting *Vrdolyak*, 206 F. Supp. 3d at 1388).)

Defendant also cites a handful of cases for the proposition that "online search results linked to a person's name do not violate the person's publicity rights." (Mot. at 8 (discussing *Nieman v. VersusLaw Inc.*, 512 F. App'x 635, 636-37 (7th Cir. 2013); *Stayart v. Google Inc.*, 783 F. Supp. 2d 1055 (E.D. Wis. 2011); *Obado v. Magedson*, No. 13-cv-2382, 2014 WL 3778261 (D.N.J. July 31, 2014).) None of these cases, however, address the Section 35(b)(1) exception or discuss how "online search results" are akin to a book or article. And even if they were applicable, each is disguisable for the same reason as *Vrdolyak*: Unlike a yellow pages-like directory (like Avvo.com or even Google), Defendant does not let non-subscribers into its

database without first buying a monthly or annual subscription. Rather, every search—even ones made by users that have created a purportedly "free" account and a limited number of "free" searches—leads to the same advertising material: a free preview and invitation to purchase subscription plans. *Gabiola*, 2017 WL 4264000, at *5. Thus, even if some of the underlying content in the RocketReach database (*e.g.*, "search results, including the search results for Plaintiff") is non-commercial in nature, the free previews are not. *Lukis*, 454 F. Supp. 3d at 762.

**2. The IRPA's (b)(2) exception does not apply because Defendant's free previews have a specific commercial purpose.**

Focusing again on the content of its database, Defendant seeks refuge under the Section 35(b)(2) exception, arguing that because its website "provides information," its use of Plaintiff's was non-commercial. (Mot. at 9 (citing 765 ILCS 1075/35(b)(2).) This argument fails for the same reasons discussed above: *all* of the free previews, along with the limited information they display, is connected to an offer to enter a commercial transaction. *See Lukis*, 454 F. Supp. 3d at 762 ("As with Instant Checkmate's appeal to Section 35(b)(1), Defendants' invocation of Section 35(b)(2) forgets that Plaintiffs' claims are directed towards the free previews, not toward the subscription services advertised by the previews."). And as set out above, because the free previews serve a "commercial purpose" for the purposes of Section 30(a), they "necessarily . . . do not serve a 'non-commercial purpose'" under Section 35(b)(2). *Id*. (citing *Maksym v. Bd. of Elec. Comm'rs of City of Chi.*, 950 N.E.2d 1051, 1062 (Ill. 2011) ("[W]here the same, or substantially the same, words or phrases appear in different parts of the same statute they will be given a generally accepted and consistent meaning, where the legislative intent is not clearly expressed to the contrary.").

Once again, Defendant provides nothing to push back against this. Defendant cites *Commodity Trend Service, Inc. v. Commodity Futures Trading Commission*, for the

unremarkable proposition that "[a] speaker's publication does not lose its status as [First Amendment] protected speech simply because the speaker advertises the publication." 149 F.3d 679, 685 (7th Cir. 1998). Fair enough. But as the next sentence in the opinion advises, "[a]n advertisement is a separate publication," *id*., and here, Plaintiff takes issue with Defendant's free preview *advertisements*, not the RocketReach website and database as a whole. She does not contend the database itself is regulable as commercial speech because there are advertisements for it. Defendant also cites *Life After Hate, Inc. v. Free Radicals Project, Inc.*, where the court found the parties agreed that a video—a "public service announcement"—fell under the Section 35(b)(2) exception, which exempts "news" and "public affairs" from the IRPA's reach. No. 18 C 6967, 2020 WL 1903956, at *6 (N.D. Ill. Apr. 16, 2020). But once again, Plaintiff's complaint is not that information about her is included in Defendant's database; rather, it is Defendant's use of her and others' identifying information in the free previews, each of which serves a particular commercial purpose as described above.

**3. The IRPA's (b)(4) exception does not apply because the free previews are used to advertise RocketReach's subscription services—not a report about Plaintiff.**

Finally, Defendant says that the exception in Section 35(b)(4) applies, because the IRPA does not cover materials that promote or advertise material that is otherwise excepted from the IRPA's reach under Sections 35(b)(1-3). (Mot. at 10.) In general, Defendant contends that "to avoid this exemption … a right of publicity claimant must show use of her identity in an advertisement for an unrelated product" rather than in a "promotion of a work in which the plaintiff appears." (*Id.* at 10-11.) The notion has some support in the IRPA case law. *See, e.g.*, *Thompson v. Getty Images (US), Inc.*, No. 13 C 1063, 2013 WL 3321612, at *2 (N.D. Ill. July 1, 2013) ("The statute's commercial purpose requirement does not prohibit the mere sale of

someone's photograph. Rather, the IRPA prohibits the use of an individual's image to promote or entice the purchase of some other product than the photograph itself."). But it has no applicability here.

The opinion in *Dobrowolski v. Intelius Inc.* helps explain why. Each of the defendants in the case "sold informational reports" on individuals. No. 17 CV 1406, 2018 WL 11185289, at *1 (N.D. Ill. May 21, 2018). To help sell the reports, the defendants purchased dynamic advertising that caused searched-for names (*e.g.*, names typed into a Google search bar) to appear in customized advertisements, which would state "We Found [NAME] – Current Address, Phone & Age." *Id.* (citation omitted). A subsequent page would give more details on the featured individual and the contents of their report. *Id.* at *3. The plaintiffs alleged this conduct was an unlawful commercial use of their identities under the IRPA. The court, however, found that the marketing materials did not violate the IRPA because the previewed materials were "not used to promote a separate product—they [were] used because plaintiffs' identifies are part of the product [i.e., the informational reports] offered for sale." *Id.* at *3. In support, the court cited to the same cases identified by Defendant: in various contexts, courts have refused to hold a defendant liable for using, for example, a picture of a photograph to sell that photograph, *Thompson*, 2013 WL 3321612, at *2 ("The Court is unpersuaded that showing a buyer a photograph of a person that she is considering whether to buy qualifies as a 'commercial purpose' as the IRPA uses that term."), or a picture of a book to sell that book, *Almeida v. Amazon*, 456 F.3d 1316, 1326 (11th Cir. 2006) (holding that Amazon's display of a book cover depicting plaintiff was not use for a commercial purpose under Florida's commercial misappropriation statute).

But again, the case is more like *Lukis*: Defendant's business model is about selling

*subscriptions* and not about selling, as was the case in *Dobrowolski*, reports about consumers that can be purchased a la carte. Thus, even if previews of individual consumer reports have a direct relation to the consumers they report on (just like a photo has a direct relation to the person it depicts and a book has a direct relation to an author portrayed on its cover), the relation between Plaintiff and Defendant's monthly subscription packages—which allow access to thousands, if not millions, data entries about individuals—is negligible. *Lukis*, 454 F. Supp. 3d at 761 ("Lukis's identity was not part and parcel of the entire product or service being advertised, meaning that Whitepages's use of her identity had a commercial purpose even on *Dobrowolski*'s understanding of Section 30(a)."). In addition, at this juncture there is no evidence what, exactly, is behind RocketReach's paywall, so it is simply not possible to conclude if any individual datasets available through the website are excepted from the IRPA's reach or not.[5] *Id.* at 762-63.

**B. The First Amendment Does Not Bar This Lawsuit.**

Even though Defendant admits the IRPA's statutory exceptions "mirror the exemptions for First Amendment-protected content," (Mot. at 6), it suggests that even if the IRPA governs its online advertising the First Amendment exempts it from liability anyway, (*id.* at 13). According to Defendant, any regulation of its website is an impermissible content-based restriction on protected speech because its website is no different than a yellow pages directory that includes third party advertising or, at least, only promotes speech that is protected by the First Amendment. (*Id.* at 14, 18.) Both arguments fail.

---

[5] Defendant tries to discount *Lukis* in a number of ways, including by noting that, in the case, the "record did not contain the 'background report' the plaintiff objected to." (Mot. at 12.) But the record addressed in *Lukis* is identical to the record here: in both instances, the complaints detail the defendants' free previews but do not provide information as to what was on the other side of their paywalls. And besides, the plaintiffs in *Lukis* didn't object to their "reports;" as Judge Feinerman pointed out again and again, they objected to the use of their identities in connection with advertisements for the defendants' *subscription* services. 454 F. Supp. 3d at 762. The same holds here.

**1. The First Amendment status of Defendant's database is not at issue here.**

Defendant hinges its First Amendment argument on its database. (Mot. at 14.) But the protected status of Defendant's online directory—i.e., the product hidden behind the free preview advertisements and Defendant's monthly or annual subscription packages—is irrelevant. As discussed herein, there is a key difference between the RocketReach website and the yellow pages (which is free to use, and uses advertising next to business listings) or an online directly like Avvo.com (which is also free to use and, like the yellow pages, also incorporates third party advertising next to listings): The *only* thing visitors to the RocketReach website see after performing an initial search are Defendant's free previews, each of which shows a limited amount of identifying information about the searched-for individual and invites users to pay for a subscription to access Defendant's directory.

These facts negate Defendant's contention that its use of free previews should be compared to traditional print or online directories, where advertising presented here-and-there alongside of directory information may not "turn the entire directory into commercial speech." (Mot. at 15 (discussing *Dex Media W., Inc. v. City of Seattle*, 696 F.3d 952, 957 (9th Cir. 2012) and *Vrdolyak*, 206 F. Supp. 3d at 1388-89).) Here, Defendant does not host advertisements alongside of a directory; it *only* presents free preview advertisements that uniformly ask users to *pay for access* to its directory. It is simply not possible to evaluate the free previews apart from the commercial transaction they propose; they are one and the same. The flipside is also true: there is no reason to determine the First Amendment status of the Defendant's database (which, the Motion contends, "does not propose a commercial transaction at all," (Mot. at 16)) because it is locked behind a paywall and, as discussed herein, simply has no bearing on Plaintiff's theory of liability.

### 2. The free previews are commercial speech that reference a specific product.

Because each of the free previews advertises a specific product (RocketReach's subscriptions) and Defendant has an economic motivation for placing the advertisements and including Plaintiff's identifying characteristics, they are commercial speech. *See Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66-67 (1983) (observing characteristics of commercial speech); *Jordan v. Jewel Food Stores, Inc.*, 743 F.3d 509, 517 (7th Cir. 2014) (quoting *United States v. Benson*, 561 F.3d 718, 725 (7th Cir. 2009)) ("We have read *Bolger* as suggesting certain guideposts for classifying speech that contains both commercial and noncommercial elements; relevant considerations include 'whether: (1) the speech is an advertisement; (2) the speech refers to a specific product; and (3) the speaker has an economic motivation for the speech.'"). Courts evaluating analogous "free preview" advertising have reached the same conclusion. *See Kolebuck-Utz*, 2021 WL 1575219, at *3 ("These allegations are sufficient to establish that Defendant's advertisements using Plaintiff's persona were, in fact, commercial speech.… Therefore, Defendant's briefing provides the Court no basis to dismiss Plaintiff's claim on First Amendment grounds."); *Lukis v. Whitepages*, No. 19 C 4871, 2020 WL 6287369, at *9 (N.D. Ill. Oct. 27, 2020) ("The free previews, if anything, present a more difficult First Amendment case for Defendants than do the background reports because they 'propose a commercial transaction' and thus fall 'within the core notion of commercial speech.' Whitepages does not explain why the free previews nevertheless qualify as noncommercial speech.") (citation omitted).

Defendant suggests that its free previews are protected because they advertise content potentially protected by the First Amendment.[6] (Mot. at 13.) Its principal support for this

---

[6] The argument also takes inferential leaps that are unwarranted here. First, as discussed *supra* § III.A.1., the free previews advertise a subscription service—not an individual report about Plaintiff.

argument is an off-hand footnote in the Supreme Court's decision in *Bolger*, 463 U.S. 60 at 67 n.14. In *Bolger*, the Court concluded that certain informational pamphlets distributed by the respondent constituted commercial speech. *Id.* at 66-68. In a footnote, the Court mused that "a different conclusion may be appropriate in a case where the pamphlet advertises an activity itself protected by the First Amendment." *Id.* at 67 n.14. Defendant urges that this comment means that any advertisement for protected speech also is protected speech.

The argument fails. The Ninth Circuit rejected the same argument in *Charles v. City of Los Angeles*, 697 F.3d 1146, 1151-53 (9th Cir. 2010). In *Charles*, the City of Los Angeles notified a self-storage facility that its display of an *E! News* billboard was in violation of the city's sign code. *Id.* at 1149. Rejecting the facility's First Amendment defense, the Ninth Circuit wrote "That the underlying E! News program is itself entitled to full First Amendment protection does not cloak all advertisements for the program with noncommercial status; speech inviting the public to watch E! News is not inherently identical to the speech that constitutes the program itself." *Id.* at 1152.[7] *See also Bolger*, 463 U.S. at 68 ("We have made clear that advertising which 'links a product to a current public debate' is not thereby entitled to the constitutional protection afforded noncommercial speech.") (citation omitted). The same conclusion is warranted here. Whatever the First Amendment status of the underlying service offered by Defendant, each of the free preview advertisements that appropriate Plaintiff's identity "propose[] a commercial transaction" for Defendant's subscription services and are therefore regulable as commercial speech. *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 482 (1989).

---

Second, discovery will tell what information is included behind the Defendant's paywall and whether it is "protected by the First Amendment" or not. *See Lukis.*, 454 F. Supp. 3d at 763.

[7] *Charles* explains that the Court's point in *Bolger* was simply that mechanical application of the commercial-speech test "might permit state action that impermissibly restricted political, religious or other protected noncommercial speech." *Id.* The Court did *not* hold that advertisements acquire the constitutional status of the underlying speech.

### 3. As commercial speech, the free previews are subject to the limitations provided by the IRPA.

Because the advertisements constitute commercial speech, "governmental burdens on [the advertisements] are scrutinized more leniently" than if they constituted noncommercial speech. *Jordan*, 743 F.3d at 515. To the extent commercial speech is protected at all by the First Amendment, it is subject to intermediate scrutiny, where it must directly advance a "substantial" government interest, and the regulation must not be more extensive than necessary to serve that interest. *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S 557, 566 (1980).

The IRPA satisfies the *Central Hudson* test. The governmental interest here is substantial because IRPA codified the common-law right of publicity, which has "[h]istorically [been one of] … four common-law invasion of privacy torts[.]" *Blair v. Nevada Landing P'ship*, 859 N.E.2d 1188, 1191 (Ill. App. Ct. 2006). And, of course, the "protection of individual privacy is a substantial government interest." *Wollschlaeger v. Governor*, 848 F.3d 1293, 1314 (11th Cir. 2017) (en banc); *see also Pearson v. Edgar*, 153 F.3d 397, 403 (7th Cir. 2006) (holding that the protection of residential privacy is a substantial governmental interest). This is also true from a property right perspective. *See Bosley v. Wildwett.com*, 310 F. Supp. 2d 914, 929 (N.D. Ohio 2004) (applying *Central Hudson* and holding that "[l]aws governing the right to publicity have a substantial interest in regulating commercial speech. Individuals have a property right in their own identity."). The IRPA is also tailored to serve these interests, which is self-evident given that the statute uses "essentially the same three elements that were required for a common-law claim of appropriation of likeness." *See Blair*, 859 N.E.2d at 1192. *See also* HB 1422, Tr. of House Debate, 90th Ill. Gen. Assem. (April 24, 1997) at 225 ("This legislation will help protect entertainers, celebrities such as Michael Jordan, as well as other ordinary people … people who do not wish to have their identities used in the commercial manner without their consent.").

Thus, the IRPA readily passes intermediate scrutiny. *Cf. Bosley*, 310 F. Supp. 2d 914 at 929 (Applying *Central Hudson* factors and holding that "limitations imposed by the right to publicity would comport with the First Amendment."); *see also Kolebuck-Utz*, 2021 WL 1575219, at *2-3 (denying defendant's First Amendment arguments without balancing interests); *Zacchini v. Scripps-Howard Broadcasting Co.*, 433 U.S. 562 (1977) (holding that the First and Fourteenth Amendments do not immunize defendants from damages for alleged infringement of the right to publicity and that the right to publicity was constitutional and comports with the First Amendment).

### C. The Communications Decency Act Is Inapplicable to Defendant's Free Preview Advertisements.

Defendant says that it is immune from suit under the Communications Decency Act ("CDA"), 47 U.S.C. § 230, because it "is merely re-publishing third-party content." (Mot. at 19.) The CDA provides a defense for "interactive computer services" from claims based on speech "provided by another information content provider." 47 U.S.C. § 230(c)(1).

The argument is misguided. "As the Seventh Circuit has explained, the CDA applies to online forums serving as 'a mere passive conduit for disseminating [actionable] statements.'" *Lukis*, 454 F. Supp. 3d at 763 (quoting *Huon v. Denton*, 841 F.3d 733, 742 (7th Cir. 2016)). This is line with the decisions from other circuits. The Ninth Circuit explained in *Fair Housing Council of San Fernando Valley v. Roommates.com, LLC* that:

> A website operator can be both a service provider and a content provider: If it passively displays content that is created entirely by third parties, then it is only a service provider with respect to that content. But as to content that it creates itself, or is 'responsible, in whole or in part' for creating or developing, the website is also a content provider. Thus, a website may be immune from liability for some of the content it displays to the public but be subject to liability for other content.

521 F.3d 1157, 1162-63 (9th Cir. 2008) (en banc). *Accord Lemmon v. Snap, Inc.*, 995 F.3d 1085,

1093 (9th Cir. 2021).

Here, Defendant is "responsible, in whole or in part" for creating or developing the free previews. *Roommates.com* holds that "development" refers to "augmenting the content" or "materially contributing to its alleged unlawfulness." 521 F.3d at 1167-68. Similarly, the Tenth Circuit has held that "neutral tools" are entitled to protection under the CDA, but if a company plays a role in generating the content—*e.g.*, by "solicit[ing] requests" for information and then transforming it into "a publicly available commodity"—the CDA no longer bars suit. *FTC v. Accusearch Inc.*, 570 F.3d 1187, 1198-1201 (10th Cir. 2009). The Seventh Circuit reached a similar result in *Huon* where it held that the CDA did not protect the defendant from liability where it "'edited,' 'shaped,' and 'choreographed'" the content of the comments it published online.[8] 841 F.3d at 742. These cases compel the conclusion that the CDA is not an obstacle to suit here. Crucially, the free previews would not appear without Defendant's decision to generate the content in the first place. As was the case in *Lukis*, Defendant is "alleged to have actively compiled and collated, from several sources, information regarding" Plaintiff and others. 454 F. Supp. 3d at 763. *Accord Kolebuck-Utz,* 2021 WL 1575219, at *3. And Defendant's decision to program the free previews to display names and other identifying information materially contributes to the advertisements' unlawfulness. In sum, Defendant's website does not serve as a passive forum for the display of advertisements displaying the names of Illinoisians, it actively

---

[8] Defendant is critical of Judge Feinerman's reliance on *Huon* because, in that opinion, the Seventh Circuit discussed the allegation that the defendant "authored" certain content on its website and, here, "Plaintiff has not alleged that RocketReach authored the information about her in its database." (Mot. at 22.) The point is neither here nor there because, again, the focus of this case is the advertisements that Defendant allegedly created, not the contents of its database. But even if the contents of the database were at issue, the Seventh Circuit credited *all* the plaintiff's allegations (including the portions noted by Judge Feinerman's opinion in *Lukis*)—not just the contention that some website content was "authored" by the defendant. *Huon,* 841 F.3d at 742 (discussing the plaintiff's "various allegations").

creates the advertisements using information it compiled. *See id*. That is enough to establish that Defendant is a "information content provider" of the content at issue in this case—and so the CDA should not apply. 47 U.S.C. § 230(c)(1); *Chi. Lawyers' Comm. For Civil Rts. Under Law, Inc. v. Craigslist, Inc.*, 519 F.3d 666, 671 (7th Cir. 2008) (CDA does not apply where a defendant is responsible for the creation of the allegedly unlawful content).

Insisting that *Lukis* is bad law, Defendant urges the Court to adopt the reasoning in *Callahan v. Ancestry.com Inc.*, where an out-of-district court recently held that an online directory compiled from yearbook information was immune from suit under the CDA. (Mot. at 21.) But *Callahan* presents a different scenario than *Lukis* and this case. In *Callahan*, the information underlying the defendant's online directory came from yearbooks provided to the site by third parties. *Callahan v. Ancestry.com Inc.*, No. 20-cv-08437, 2021 WL 2433893, at *5 (N.D. Cal. June 15, 2021). Because the defendant "obviously did not create the yearbooks" and, instead, "used information provided by another information-content provider [the court held it was] immune under § 230(c)(1)." *Id*. But here, in contrast, no other information-content provider "provided" Defendant with anything; rather, as in *Lukis*, RocketReach allegedly "compiled and collated [information] from several sources" itself and, in so doing, assumed an active role in creating all the content on its website, *Lukis*, 454 F. Supp. 3d at 763, rather than simply "adding functionality" to what others had provided to it, *Callahan v. Ancestry.com Inc.*, No. 20-CV-08437-LB, 2021 WL 783524, at *6 (N.D. Cal. Mar. 1, 2021). In this regard, *Callahan* lines up with the other several cases cited by Defendant concerning challenged content created by another party. *See, e.g.*, *Chi. Lawyers' Comm. For Civil Rts. Under Law, Inc.*, 519 F.3d at 671 (CDA bars claims against Craigslist under Fair Housing Act for ads placed on the website by users); *Parker v. PayPal*, No. 16-4786, 2017 WL 3508759, at *7 (E.D. Pa. Aug. 16, 2017) (CDA bars

claims against online marketplace for hosting a third party's misappropriation of the plaintiff's work); *Hadley v. Gatehouse Media Freeport Holdings, Inc.*, No. 12 C 1548, 2012 WL 2866463, at *2 (N.D. Ill. July 10, 2012) (CDA bars claims against website host that allows readers to post comments); *Ben Ezra, Weinstein, & Co., Inc. v. Am. Online Inc.*, 206 F.3d 980, 986 (10th Cir. 2000) (CDA bars claim against website that published inaccurate stock information provided to it by third party). Because Defendant took an active role in developing the content for its website—rather than passively providing a forum on which *other* parties could post or supply content—*Callahan* does not suggest a different outcome here.

**D. The IRPA Does Not Violate the Dormant Commerce Clause.**

Finally, Defendant raises a cursory argument under the dormant commerce clause, claiming that the burdens imposed by the IRPA are excessive compared to the state's "*de minimis*" interest in protecting the privacy rights of its residents. (Mot. at 22.) The argument is a nonstarter.

Initially, the argument is premature: there is nothing pleaded about Defendant's supposed burden of complying with Illinois law, and Defendant offers nothing else on the point. Nor could it at this stage. *See Rivera v. Google Inc.*, 238 F. Supp. 3d 1088, 1104 (N.D. Ill. 2017) (tabling Google's argument that an analogous statute violated the dormant commerce clause, stating "the parties need to develop what Google's burdens of compliance would actually be under the Privacy Act, if it were read in the way the Plaintiffs suggest").

But even on its merits, the argument fails. First, and as discussed *supra*, the IRPA does not represent a "negligible" or "de minimis" state interest. To the contrary, it is significant, *supra* § III.B.3., and not, as Defendant suggests, "limited to a false endorsement claim." *Dobrowolski v. Intelius, Inc.*, No. 17 CV 1406, 2017 WL 3720170, at *8 (N.D. Ill. Aug. 29, 2017) (citations

omitted) (noting that the "legislative history merely indicates that endorsements were the most prevalent example of IRPA's potential application and that the debates also touched on other concerns," that "IRPA's definition of 'commercial purpose' is broad," and that "the act contains no endorsement requirement").

Further, Plaintiff does not seek to apply the IRPA outside of Illinois. Rather, she only seeks to hold Defendant accountable for its use of Illinois residents' identities in violation of an Illinois statute. *Cf. Envt'l Def. Fund v. Massey*, 986 F.2d 528, 531 (D.C. Cir. 1993) (finding that the presumption against extraterritorial application does not apply when the conduct occurs within the regulating jurisdiction's borders). To this end, *In re Facebook Biometric Information Privacy Litigation*, No. 3:15-cv-03747, 2018 WL 2197546 (N.D. Cal. May 14, 2018) is instructive. There, plaintiffs alleged that their "biometric data was harvested" by Facebook's Tag Suggestion feature and thus violated the Illinois Biometric Information Privacy Act, which "requires private entities to provide notice and obtain consent when either 'biometric identifiers or biometric information' are at issue." *Id.* at *2, *6. Facebook argued that applying BIPA violated the dormant commerce clause because "it processes facial recognition on servers outside the state of Illinois." *Id.* at *4. The court rejected the argument, stating that "Facebook's concerns are not well taken" because "the application of BIPA to Illinois users does not have the impermissible ''practical effect' of regulating commerce wholly outside' Illinois." *Id*. (quoting *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 332 (1989)). Instead, and as is the case here, the court noted that "[t]his lawsuit is under an Illinois state statute on behalf of Illinois residents who used Facebook in Illinois" and "[n]othing indicates that liability under BIPA would force Facebook to change its practices with respect to residents of other states." *Id.* at *4.

## IV. CONCLUSION

Defendant provides no reason why this Court should uniquely find that its conduct did not violate the IRPA, when the identical conduct of its peers does. For all the reasons discussed here, the Court should deny the Defendant's Motion in its entirety.

Respectfully Submitted,

**AIMEE KRAUSE,** individually and on behalf of all others similarly situated,

Dated: July 2, 2021

By: /s/ Benjamin Thomassen
One of Plaintiff's Attorneys

Benjamin H. Richman
brichman@edelson.com
Ari J. Scharg
ascharg@edelson.com
Benjamin S. Thomassen
bthomassen@edelson.com
Albert J. Plawinski
aplawinski@edelson.com
EDELSON PC
350 N. LaSalle St., 14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

*Attorneys for Plaintiff and the Class*